*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

SHARON SCHRAM,

        Plaintiff-Appellant,

v

DOW SILICONES CORPORATION, formerly known as DOW CORNING CORPORATION, ANNETTE GLENN, and ANNETTE GLENN FOR STATE SENATE,

        Defendants,

and

CHRISTIAN VELASQUEZ and CHRISTIAN VELASQUEZ FOR STATE SENATE,

        Defendants-Appellees.

FOR PUBLICATION
July 01, 2026
2:45 PM

No. 370019
Midland Circuit Court
LC No. 22-001400-NZ

Before: SWARTZLE, P.J., and GARRETT and WALLACE, JJ.

SWARTZLE, P.J.

Plaintiff became the topic of a negative political campaign through no fault of her own. Although her frustration is understandable, it is not actionable. The statements or reasonable inferences that she claims are defamatory and paint her in a false light are either not about her, factually true, lacking evidentiary support, or constitutionally protected opinions. Accordingly, the trial court correctly granted summary disposition to the defendants who remained in the case, and we affirm.

## I. BACKGROUND

A brief note on nomenclature at the outset: In this appeal, the only defendants who are appellees are Christian Velasquez and his senate campaign committee. Although the two are technically separate defendants, the parties treat the two as practically synonymous, and there is

no argument presented on appeal by Velasquez that he should avoid liability because his campaign committee made a particular statement. Accordingly, for purposes of this opinion, the two defendant-appellees will be denoted as "Velasquez" or "defendant," unless the context otherwise makes clear. Likewise, there are several iterations of corporate ownership that involve Dow Silicones Corporation f/k/a Dow Corning Corporation, so for simplicity, that corporate defendant will be referred to here as "Dow Corning."

To understand the present case, we must go back to a prior federal lawsuit and an ensuing state senatorial contest. Sharon Schram previously worked at Dow Corning, and she sued her former employer in the U.S. District Court for the Eastern District of Michigan, alleging several employment-related claims: retaliation and interference under the family and medical leave act (FMLA), 29 USC 2601 *et seq.*; disability discrimination under the persons with disabilities civil rights act, MCL 37.1101 *et seq.*; retaliation under the worker's disability compensation act of 1969, MCL 418.101 *et seq.*; and sex discrimination under the Elliott-Larsen civil rights act, MCL 37.2101 *et seq*.

Velasquez also formerly worked at Dow Corning, and during part of the relevant time, he was a manager several levels above Schram. He was a witness in the federal lawsuit, and several of Schram's factual allegations involved him, but he was not named as a defendant in the lawsuit.

After the close of discovery in the federal case, Dow Corning moved for summary judgment under Federal Rule of Civil Procedure 56. When analyzing Dow Corning's motion, the district court viewed all of the record evidence presented to it in the light most favorable to Schram as the non-movant, and likewise drew all reasonable factual inferences in her favor. The district court concluded that there were genuine issues of material fact on all of Schram's claims, with the exception of her theory of interference under the FMLA. *Schram v Dow Corning Corp*, unpublished opinion of the United States District Court for the Eastern District of Michigan, issued January 8, 2018 (Case No. 16-14312), p 39. After the federal court issued its opinion, Schram and Dow Corning settled the lawsuit on the eve of trial in February 2018; as part of the settlement, the parties included several confidentiality provisions, whereby the parties agreed not to discuss publicly or privately the terms of the settlement or the merits of the federal lawsuit.

At some point, Velasquez left Dow Corning to campaign for a state senate seat. During the primary season in 2022, his political opponent, then-Michigan House Rep. Annette Glenn, published and distributed a mailer advertisement that stated in relevant part, "We can trust Rep. Annette Glenn to ensure men and women are treated *equally* under the law," and then asked rhetorically, "Can we trust her primary opponent, Chris Velasquez, to do the same? Flip this card over and decide for yourself." The back of the mailer included an excerpt from the federal court's opinion denying summary judgment to Dow Corning. The material appeared in the mailer as follows:

> The (female) plaintiff has substantiated her claim for gender discrimination. It is undisputed that plaintiff is a member of a protected class (female). . . . The record adequately demonstrates that the plaintiff was subjected to an "adverse action" when she was transferred from her permanent role to a temporary position, from which she later was terminated. . .

The plaintiff also has offered evidence that the defendant's stated reasons for its actions—poor performance—was a pretext for unlawful discrimination. The jury could conclude—with good reason—that the purported poor performance cited by defendant as grounds for the redeployment was mere pretext fabricated and relied upon to appease CHRIS VELASQUEZ'S unlawfully discriminatory desire to favor his male subordinate and acquaintance by "bumping" (the female executive) out of her job in order to make way for Velasquez's male subordinate. . .

Velasquez asserts that it was "not his decision" to replace (the female executive) with (his male subordinate), and that (another female executive) made the call; but that testimony is belied by (that other female executive's) insistence that she was not involved, which is corroborated by her conspicuous silence during the December email exchange, contrasted with Velasquez's active participation and insistence on advancing the timeline. Velasquez's role in the decision also is substantiated by the email sent by (his male subordinate) to the (corporation's) human resources department, stating that (he) had consulted his manager and that "he" (meaning Velasquez) had approved the hiring and relocation process. . .

Moreover, the evidence of pretext as to the gender discrimination claim also is bolstered by (another executive's) admission, documented by (the company's) HR investigator, that (the fired female executive) deliberately was "bumped" from her job so that she could be replaced by a male. . . And Velasquez's underlying motive of displacing (the fired female executive) to favor (his male subordinate) is evident from his attempts to accelerate the timeline.

The mailer included the federal judge's name; the federal court district; the case number; the date of the opinion; and a link to the full decision. The mailer did not identify Schram or Dow Corning as the parties to the lawsuit.

The Glenn campaign followed this mailer with a press release on its Facebook page entitled, "REP. GLENN REFUNDS PAST CAMPAIGN CONTRIBUTIONS FROM CHRISTIAN VELASQUEZ." The press release included excerpts from an article that had earlier been published by the *Michigan Information & Research Service* (*MIRS*). Most of that article focused on responses by Rep. Glenn about the earlier mailer and the federal lawsuit, though the article did include the following statements by Velasquez:

Velasquez said he is not allowed to discuss the case in detail because he signed a non-disclosure agreement when Dow settled the lawsuit. He said Glenn and her husband have a history of negative campaigning and he questioned why they felt "that road" is the path to take.

"I fired no one. There's no judgment against me. Dow settled it," he said. "I worked with thousands of women throughout Dow . . . and yes, I managed a lot of women. In fact, when I was going into that job, my last three hires before that were women. . . . Whatever happened with (the plaintiff) happened years down the road from a different department."

Additionally, the article noted, "Velasquez said the use of the emails (referenced in the federal court's opinion) were taken out of context, but he reiterated he could not discuss details."

On July 7, 2022, the Velasquez campaign responded to the Glenn mailer with the following post on its Facebook page:

A career politician in the primary race for the new and open 35th District Michigan Senate seat continues to produce attacks on candidates, including me. She found a human resource legal case against a corporation in which I was a witness and imply [sic] that I was the defendant. While their negative campaign piece is misleading and untrue, negative ads and lies can no longer be ignored.

During my 29 years with Dow and Dow Corning, I worked with thousands of women, earned a reputation for being fair, and am credited as an advocate throughout their career journeys. My commitment to ensuring equal opportunity to all people is unwavering.

A portion of this statement was picked up that same day for an article in the local *Chemical City Paper*. The article included another response by Velasquez: " 'They're making it seem like I'm the defendant and I was merely a witness,' Mr. Velasquez told the *City Paper*. 'I was the manager of the manager managing this person.' "

A senator from another mid-Michigan district, Ken Horn, got involved and defended Velasquez against Rep. Glenn's attacks. Sen. Horn made a Facebook post related to the Glenn mailer, and this post was shared on Velasquez's own Facebook page and mentioned in the *MIRS* and *Chemical City Paper* articles. Discussing his disdain for "negative campaigning amongst friends," Sen. Horn elaborated:

The literature that Annette Glenn sent out against Chris Velasquez was both half-cocked and less than half factual. I've spent thirty years fighting this kind of nasty politics, and all that time protecting my constituents from half-truths . . . .

But know that Chris Velasquez is a good and decent man, who didn't deserve this unprovoked negative attack against him.

On July 12, 2022, Todd Gambrell wrote a letter to the editor of the *Midland Daily News*, describing himself as a person heavily "involved in local, state and federal Republican candidate campaigns since 1984." In discussing the Glenn mailer, Gambrell wrote, "The ad provides a wildly distorted and intentionally misleading take on a case that never went anywhere and only involved [Velasquez] because he was a leader at the Dow Corning Corporation." The piece found its way to Facebook, and Velasquez "liked" it, though he did not repost it to his own page.

After this back-and-forth between the Glenn and Velasquez campaigns and other persons,[1] Schram sued Dow Silicones Corporation (f/k/a Dow Corning), Annette Glenn, Annette Glenn for State Senate, Velasquez, and Christian Velasquez for State Senate in Midland Circuit Court.

---

[1] Rep. Glenn ultimately defeated Velasquez in the Republican primary, but lost in the 2022 general election.

Relevant to this appeal, Schram claimed that Velasquez and his campaign committee defamed her and presented her in a false light. During discovery, the following thirteen statements by or purportedly attributable to Velasquez were identified as defamatory:

**Statement One:** Velasquez called Glenn's accusations "half the facts, or a quarter of the facts accusation."

**Statement Two:** "It's [the Glenn's mailer] an untruth. It's a dirty little mudslinging effort by the Glenns to try to influence people."

**Statement Three:** "I'm not going to say anything negative. I'm working for the people of this new 35th to represent them in a civil and respectful way and drive the issues that matter to them, which is really the economy, inflation, education, energy, and the roads and taxes."

**Statement Four:** In response to Glenn's statement regarding the refunding of a previous campaign contribution from Velasquez, Velasquez stated, "Just another example of me supporting women."

**Statement Five:** "I fired no one. There's no judgment against me. Dow settled it . . . I worked with thousands of women throughout Dow . . . and yes, I managed a lot of women. In fact, when I was going into that job, my last three hires before that were women . . . . Whatever happened with (the plaintiff) happened years down the road from a different department."

**Statement Six:** Velasquez said the use of emails were "taken out of context," but reiterated he could not discuss details.

**Statement Seven:** "They're making it seem like I'm a defendant and I was merely a witness."

**Statement Eight:** "I was the manager of the manager managing the place."

**Statement Nine:** "During my 29 years with Dow and Dow Corning, I worked with thousands of women, earned a reputation for being fair, and am credited as an advocate throughout their career journeys. My commitment to ensuring equal opportunity to all is unwavering."

**Statement Ten:** "It's a disappointment that the Glenns continue to run a negative campaign against me and other candidates instead of focusing on what they bring to the table."

**Statement Eleven:** "A career politician in the primary race for the new and open 35th District Michigan Senate seat continues to produce attacks on candidates, including me. She found a human resource legal case against a corporation in which I was a witness and imply [sic] that I was the defendant. While their negative campaign piece is misleading and untrue, negative ads and lies can no longer be ignored.

"During my 29 years with Dow and Dow Corning, I worked with thousands of women, earned a reputation for being fair, and am credited as an advocate throughout their career journeys. My commitment to ensuring equal opportunity to all is unwavering.

"I invite you to learn more about all the candidates, including me. As the candidate that has lived in our district the longest, my engagement at work and service in our community can be easily found.

"Team Velasquez will continue our issues-based campaign that we believe will strengthen our community. Please join us in restoring the American dream. I want to earn your vote on August 2nd."

**Statement Twelve:** Velasquez intends to "strongly defend" himself against the present lawsuit that named him as one of the defendants.

**Statement Thirteen:** In response to the present lawsuit, "We are unable to comment in detail given the early stages of the trial [sic], and because it also originated in a previous lawsuit between plaintiffs Schram and Dow, in which Christian was not a party . . . . Furthermore, the current lawsuit in Midland County Circuit Court surrounds the terms of an alleged agreement between Ms. Schram and Dow to which, again, Christian was not a party or signatory. Attempts were made to obtain a copy of that agreement. [sic] Ms. Schram's counsel, but is unwilling to provide it at this time [sic] . . . . Christian and his campaign intent to vigorously defend this current case filed last week – whose time is not lost on his campaign. Over [sic] the career, he earned a solid reputation for being fair and advocating strongly for the career advancement of others, regardless of their gender. Suggestions to the contrary, including recent slant attacks, in the kinds of career politicians and their supporters [sic] There are a few more examples of involvement. [sic] Wanting to remove Christians [sic] from politics."

There was a fourteenth statement that Velasquez allegedly made to Schram directly, while he was knocking doors during the campaign, the gist of which was an apology of sorts that Schram got dragged into the political mudslinging.

Defense counsel deposed Schram. During her deposition, Schram repeatedly indicated that she could not talk about the underlying merits of her prior federal lawsuit, given the confidentiality provisions of the settlement agreement. At one point she lamented, "I can't talk about the case . . . ." and several minutes later said, "I can't tell my story . . . . Did my entire story get out [during the federal lawsuit]? No." With respect to the various statements of Velasquez, Schram testified, "[Velasquez] was posting things . . . again, he tried to distance himself and his innocence instead of just owning the facts. This wasn't an opinion, this was a judge's ruling, a federal judge's ruling, not an opinion of Sharon Schram." When asked about the Glenn mailer that was the impetus for subsequent statements by Velasquez and others, Schram opined, "[Glenn] published facts. She published the Judge's brief. She merely brought to light what was already there. That's factual. I don't think that's under debate." Schram asserted that Velasquez defamed her whenever he made a public statement responding to Glenn's mailer.

After the close of discovery, both Velasquez and Dow Corning moved for summary disposition under MCR 2.116(C)(10). (The claims against the Glenn defendants were dismissed separately.) For his part, Velasquez argued that Schram's complaint alleged statements that were not actionable for purposes of defamation or false light. Attached to the motion was a transcript of Velasquez's deposition, in which he testified that his statements were referring to the "general stories" told by Rep. Glenn and that the mailer was not the "whole story." Velasquez testified that his statements were in references to his relative lack of involvement in the lawsuit and, when asked whether he thought that the words he was stating would have had "the implication that the lawsuit was not meritorious," he answered no.

The trial court granted defendants' summary disposition motion. Regarding her defamation claims, the trial court found that most of the statements attributed to Velasquez were about the Glenn mailer and not Schram because she was never named. The trial court held that Schram had failed to meet the elements of a defamation claim because most, if not all, of the allegedly defamatory statements were opinions that could not be proven true or false. As for Schram's false-light invasion of privacy claims, the trial court held that the statements attributed to Velasquez were not made with actual malice.

Schram appealed the dismissal of her defamation and false-light claims against Velasquez and his campaign committee.

## II. ANALYSIS

### A. STANDARD OF REVIEW

On appeal, Schram argues that the trial court erred by dismissing her defamation and false-light claims against Velasquez and his campaign committee. The Court reviews de novo the trial court's decision on a motion for summary disposition; it also reviews de novo the trial court's application of the constitutional standard for defamation and false-light invasion of privacy. *Reighard v ESPN, Inc*, 341 Mich App 526, 536-537, 554; 991 NW2d 803 (2022). Because the Court reviews these matters de novo, it need not agree with every aspect of the trial court's reasoning, and yet it may still affirm that court's decision.

Summary disposition under MCR 2.116(C)(10) is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine issue on a material fact, and the moving party is entitled to judgment as a matter of law. *Id.* at 537. "A genuine issue of material fact exists when the record leaves open an issue upon which reasonable minds might differ." *Id.* (cleaned up).

### B. DEFAMATION AND FALSE LIGHT

We consider together Schram's claims of defamation and false-light invasion of privacy, given that they share common factual allegations, have several overlapping elements, and involve specific limitations under the First Amendment. See *Edwards v Detroit News, Inc*, 322 Mich App 1, 12; 910 NW2d 394 (2017).

"When considering a defamation claim, the Court must make an independent examination of the facts to make sure that the speaker's First Amendment right of free expression is preserved."

*Id.* (internal quotation marks omitted). To make a claim of defamation, a plaintiff must prove the following:

> (1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication. [*Id.* (cleaned up).]

"These elements must be specifically pleaded, including the allegations with respect to the defamatory words, the connection between the plaintiff and the defamatory words, and the publication of the alleged defamatory words." *Gonyea v Motor Parts Fed Credit Union*, 192 Mich App 74, 77; 480 NW2d 297 (1991) (citation omitted).

"If a statement cannot be reasonably interpreted as stating actual facts about the plaintiff, it is protected by the First Amendment." *Ireland v Edwards*, 230 Mich App 607, 614; 584 NW2d 632 (1998) (cleaned up). "An additional requirement exists when the communication is made with reference to a public figure as opposed to a nonpublic private individual. With respect to a public figure, the defamatory statement must also have been made with actual malice, not just negligence." *Edwards*, 322 Mich App at 12.

As for a false-light invasion of privacy claim, a plaintiff must show that the defendant broadcasted to the public or to a large number of people "information that was unreasonable and highly objectionable by attributing to the plaintiff characteristics, conduct, or beliefs that were false and placed the plaintiff in a false position." *Puetz v Spectrum Health Hosps*, 324 Mich App 51, 69; 919 NW2d 439 (2018). The defendant "must have known or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the plaintiff would be placed." *Id.* A plaintiff "must establish that when the defendant disseminated the information, it was done with actual knowledge or reckless disregard of the truth or falsity of the publicized matter." *Id.* at 74 (cleaned up). Unlike defamation, "malice is an element of false-light invasion of privacy, regardless of whether the plaintiff is a public or private figure." *Found for Behavioral Resources v W E Upjohn Unemployment Trustee Corp*, 332 Mich App 406, 413; 957 NW2d 352 (2020).

Not all defamatory or false-light statements—even those made with actual malice—are actionable. *Edwards*, 322 Mich App at 13. "The First Amendment protects communications that cannot be reasonably interpreted as stating actual facts about the plaintiff, i.e., expressions of opinion are protected." *Id.* (cleaned up). There are "several categories of speech that fall within the constitutionally protected class of opinion speech, including":

> (1) statements that are both objectively verifiable but also necessarily subjective; (2) parodies, political cartoons, satires, and other statements that, while factual on their face and provable as false, could not reasonably be interpreted as stating actual facts about the plaintiff; (3) statements that both do and do not state actual facts about a person; and (4) expressions of opinion that otherwise constitute no more than rhetorical hyperbole or vigorous epithet, such as calling someone a "crook" or "traitor." [*Id.* (cleaned up).]

The First Amendment's broad protection is not, however, "an absolute bar" against a defamation or false-light claim. "Statements that are not protected and therefore are actionable include false statements of fact, i.e., those that state actual facts but are objectively provable as false and direct accusations or inferences of criminal conduct." *Id.*

## C. SCHRAM'S CLAIMS

## 1. DEFAMATION BY IMPLICATION

The first thing to note about the purported defamatory and false-light statements in this matter is that hardly any of them refer directly to Schram. Only Statements Five and Thirteen have direct references to Schram herself, and neither of these include a statement that could be read on its face to lower her reputation in the community or deter others from "associating or dealing" with her. *Ireland*, 230 Mich App at 614, 619. The assertion in Statement Five that refers to Schram implies that her legal dispute with Dow Corning happened years before the then-current senate campaign. Not only is there nothing damaging to Schram's reputation with regard to the timing of the prior federal lawsuit, but the statement appears to be factually true, given the timing of when that lawsuit was filed and when Velasquez made the statement. Similarly, the direct statements about Schram in Statement Thirteen obliquely point to the current lawsuit and the confidentiality provisions of the settlement agreement, which again, are neither damaging to her reputation nor objectively false.

Schram appears to recognize the lack of any direct defamatory or false-light statements in the record, because she relies on the "defamation by implication" doctrine on appeal. But even here, her reliance on this doctrine is not straightforward. In the typical defamation-by-implication case, there are two or more factually true statements that, when juxtaposed with each other, imply a false meaning. The false meaning comes about when the statements are factually true only in isolation; they are missing key context. When the isolated statements, without the necessary context, are read together, a false notion is implied. See, e.g., *Reighard*, 341 Mich App at 540-541; *Hawkins v Mercy Health Servs, Inc*, 230 Mich App 315, 330; 583 NW2d 725 (1998).

In this case, Schram has not pointed to any statements by Velasquez that, when juxtaposed, fit within the classic category of defamation by implication. Instead, Schram points to statements Velasquez made or adopted as his own that purportedly imply that Schram's federal lawsuit was without merit. This argument would seem to fit better within a different category of defamation by implication, where there is the selective omission of material facts that then creates a defamatory implication. See, e.g., *Toney v WCCO Television, Midwest Cable & Satellite, Inc*, 85 F3d 383, 387 (CA 8, 1996) (discussing Minnesota law). For example, Schram testified that when "[Velasquez] was posting things . . . again, he tried to distance himself and his innocence instead of just owning the facts." She believed that whenever Velasquez responded to Glenn's mailer and tried to minimize his involvement in the federal lawsuit, he was defaming her.

Presented in this way, the key question for her defamation-by-implication theory "is whether a reasonable fact-finder could conclude that the statement implies a defamatory meaning." *Smith v Anonymous Joint Enterprise*, 487 Mich 102, 128; 793 NW2d 533 (2010). Defamation by implication is not "so analytically distinct" from traditional defamation "as to require a departure from the guiding principles of general libel and First Amendment libel law." *Locricchio v Evening*

*News Ass'n*, 438 Mich 84, 132; 476 NW2d 112 (1991). Specifically, "an action for defamation by implication must still conform to the three guiding constitutional principles . . . : speech on public matters initiates heightened First Amendment protection, true speech on public affairs cannot accrue liability, and a plaintiff bears the burden of proving falsity." *Id.* at 132-133. Furthermore, as with any defamation claim, a claimant pursing a claim of defamation by implication "must demonstrate a statement or implication capable of defamatory meaning and prove falsity and fault." *Id.* at 133.

## 2. NO DEFAMATORY IMPLICATION

With this understanding, it is clear that most of the identified statements have no defamatory implications with regard to Schram. First, there are several statements actually made by others that Schram tries to attribute to Velasquez. With respect to the statements made by Gambrell, there is nothing in the record to suggest that Velasquez adopted them as his own or is otherwise responsible for them. The only relevant evidence in the record connecting Velasquez to Gambrell's statements is a Facebook "like" that Velasquez made to the *Chemical City Press* piece. The mere "like"-ing of a purported defamatory statement on social media is not sufficient for republication purposes, i.e., it does not communicate that statement to a new audience. See *Clark v Viacom Intern Inc*, 617 F Appx 495, 505 (CA 6, 2015); see also *Gallagher v Maternitywise Int'l, LLC*, unpublished opinion of the United States District Court for the District of Hawaii, issued November 1, 2022 (Case No. CV 18-00364), pp 7-8. Rather, a social media "like" merely shows that the reader approves, in some manner, some or all the purportedly defamatory statement. It is analogous to a reviewer leaving a "four out of five star" review of a defamatory book on Amazon.com. A mere sign of approval of a defamatory statement does not ensnare the reader into some kind of defamatory or false-light conspiracy. In contrast, with respect to the statements made by Sen. Horn, we will assume that Velasquez republished them when he shared them on his own Facebook page and added introductory text to the senator's supportive message.

Second, most of the statements made by or attributable to Velasquez cannot reasonably be read to have had or implied a defamatory or false-light meaning with respect to Schram. Many of them clearly target Rep. Glenn and her campaign for the Michigan Senate, not Schram herself. For example, by disclaiming any "negative" campaigning, Velasquez was contrasting his approach to politics from that of Rep. Glenn and her campaign. Other examples include references to "[t]hey're making it seem like I'm a defendant" and "[j]ust another example of me supporting women." These and other similar statements cannot be reasonably understood to refer to Schram, even by implication.

With respect to several other statements, "even the most careless reader" would understand them to be mere "rhetorical hyperbole." *Ireland*, 230 Mich App at 618-619 (internal brackets omitted). Like the term "blackmail" in *Ireland*, *id.* at 618, terms like "mudslinging" and "half-cocked" are commonplace in political campaigns and are not to be taken literally. These are expressions of disapproval by Velasquez and his supporters against Rep. Glenn and her campaign tactics, rather than sober evaluations of Schram's claims of workplace improprieties. On the flip side, statements like, "My commitment to ensuring equal opportunity to all people is unwavering" are understood by a reasonable reader to be a type of platitude that is ubiquitous in modern-day political campaigns.

Other statements are plainly true and do not connote any disreputable assertions about Schram. For example, there is nothing defamatory about the statement that Velasquez was not a party to the federal lawsuit (because it is a true statement), nor does it imply anything defamatory about Schram (as she presumably chose for whatever reason not to sue Velasquez in that prior lawsuit). There is no other piece of evidence with which to compare his non-party status and derive a defamatory conclusion, nor is there a direct implication to be drawn that has a defamatory meaning. Similarly, there is nothing defamatory, either on its face or implied, with statements about where Velasquez was in comparison to Schram in the corporate structure, whether he terminated the employment of anyone (Schram sued Dow Corning as her employer), that there was no judgment against him in the federal lawsuit (true, both because he was not a party and the case settled), the gender of his most recent hires, etc. When Velasquez asserted that Rep. Glenn's accusations amounted to no more than "half the facts, or quarter of the facts," that can only reasonably be read as a figure of speech—and, in fact, it was a figure of speech that mirrored reality, as the excerpt of the federal court's opinion included in Glenn's mailer was just several paragraphs dealing with one claim, pulled from a judicial opinion that spanned four claims analyzed over thirty-nine pages.

### 3. "AN UNTRUTH" / "MISLEADING AND UNTRUE"

*Qualified Privilege.* The closest that Schram gets to identifying something that might, under certain circumstances, have an implied defamatory meaning are the following two statements:

- Glenn's mailer was "an untruth" (Statement Two); and

- Glenn's mailer was "misleading and untrue" (Statement Eleven).

From these statements, it is argued, Velasquez implied that Schram's federal lawsuit, specifically her claim of sex discrimination, was based on factual inaccuracies, misstatements, and even lies. And from this implication, the next necessary implication would be that Schram herself was a liar. This appears to be the nub of Schram's case against Velasquez.

Even assuming without deciding that a reasonable reader could infer this meaning from Velasquez's actual statements, Schram's defamation and false-light claims fail. Generally speaking, there is an absolute privilege for judges, attorneys, and witnesses to speak during the course of a judicial proceeding, when the speech is "relevant, material, or pertinent to the issue being tried." *Osterle v Wallace*, 272 Mich App 260, 264; 725 NW2d 470 (2006). Velasquez did not make these statements within the context of the federal lawsuit (e.g., during a deposition), but rather several years after the lawsuit had settled in the context of a political campaign. As such, the statements were not absolutely privileged from claims of defamation or false light.

With that said, the statements were made in response to insinuations by the Glenn campaign that Velasquez discriminated against Schram during her employment at Dow Corning. By the actions of the Glenn campaign, in other words, the question of whether Velasquez treated a person in the workplace unlawfully became a matter of public concern in the campaign for the Michigan Senate seat. In this circumstance, there is a qualified privilege by the target of the attack to put out his "side of the story before the general population." *Baggs v Eagle-Picher Indus, Inc*, 750 F Supp 264, 271 (WD Mich, 1990) (applying Michigan law). More generally, a person has a qualified

privilege to make a statement, otherwise actionable, "where the person is so situated that it becomes right in the interests of society that he should tell third persons certain facts, which he in good faith proceeds to do." *Id.* at 270; cf 50 Am Jur 2d, Libel and Slander, *Privilege for fair comment and criticism*, § 311, pp 716-720.

"If the Court determines that defendant had a qualified privilege to make the statements, it must then determine whether a dispute as to a material issue of fact exists with regard to whether defendant made the statement with actual malice and whether the statements were false." *Id.* (citations omitted). "In order to prove actual malice, [Schram] must show that defendant made the statements with knowledge that they were false or with reckless disregard as to whether they were false or not." *Id.* (citations omitted).

The "good faith" and "actual malice" elements of the qualified privilege, if not synonymous in theory, certainly overlap in relevant ways here. It would be difficult to find, for instance, that Velasquez acted in good faith while at the same time with reckless disregard as to the falsity of a statement. Thus, for our purposes, we will consider the two elements together.

Considered together, there is no genuine issue of material fact as to whether Velasquez acted in good faith and without actual malice to Schram when he said that the Glenn campaign mailer was "an untruth" and "misleading and untrue." A reasonable reader would not expect that someone involved in a lawsuit—even as a nonparty—would show the objectivity of a judge when talking about the lawsuit. In other words, the notion that opposing sides in a lawsuit might view and describe contested evidence in different lights can hardly be called defamatory or false light, without more. Here, other than the occasional rhetorical hyperbole directed at the Glenn campaign, Velasquez's public statements about the federal lawsuit were measured and sober. Velasquez defended his perception of the rightness of his actions while at Dow Corning, and he did so using non-inflammatory, even prosaic language.

Had the federal lawsuit concluded with a judgment in favor of Schram on her sex-discrimination claim and had the evidence at trial shown persuasively that Velasquez was involved in that discrimination, then there might have been a question of fact regarding good faith and actual malice as well as the factual accuracy of his statements. It is one thing to defend the rightness of one's actions when there is no judicial determination of guilt or liability; it is another thing to do so after there has been a conclusive finding of guilt or liability. Rather than a final judgment on the merits, however, Schram and Dow Corning settled the lawsuit on the eve of trial in 2018, subject to a confidentiality agreement, without any admission of liability by the company or any of its employees. Thus, by the time Velasquez made the statements in 2022, Schram had foreclosed any opportunity to resolve her claim publicly in the federal lawsuit.

Schram tries to avoid this obstacle by relying on the federal court's opinion, specifically the portion excerpted in the Glenn mailer. In doing so, she appears to claim that the federal court made certain findings of fact that conclusively found fault with Velasquez, and thus his denial of fault and downplaying of his role were necessarily untruthful. This is made especially clear when Schram testified during her deposition, "[Glenn] published facts. She published the Judge's brief. She merely brought to light what was already there. That's factual. I don't think that's under debate." Similarly on appeal, Schram asserts, "Defendant Velasquez refers to Plaintiff's legal

-12-

contentions as being misleading and untrue, which were factually supported as established in [the federal court's] opinion, which was directly quoted in the campaign piece."

The federal court did not settle the debate on whether Schram faced discrimination at Dow Corning. To see this fact, it is critical to note that the federal court's opinion resolved Dow Corning's motion for summary judgment under Federal Rule of Civil Procedure 56. Under that court rule, similar to our MCR 2.116(C)(10), a federal court does *not* make findings of fact. Instead, the federal court reviews the evidence in the record and evaluates that evidence in terms of the claims or defenses at issue. Fed R Civ P 56(c). In doing so, the federal court views the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in favor of that non-moving party. *HGB Mktg, Inc v Pomeroy Computer Resources, Inc*, 145 F Appx 982, 985 (CA 6, 2005). As the United States Supreme Court has explained, "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v Liberty Lobby, Inc*, 477 US 242, 249; 106 S Ct 2505; 91 L Ed 2d 202 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* at 255. Contrast this with an opinion after a bench trial, when a federal court "must find the facts specially and state its conclusions of law separately" in an opinion. Fed R Civ P 52(a)(1).

Review of the Glenn mailer specifically, and the federal court's opinion more generally, confirms that the court was not making findings of fact. Instead, the federal court concluded that, based on the evidence before it, a future fact-finder could reasonably make certain findings of fact and draw certain factual inferences that could support Schram's claims. As the federal court expressly held, "The plaintiff [Schram] has offered sufficient evidence to defeat summary judgment and *proceed to trial* on her pleaded claims." *Schram*, unpub op at 39 (emphasis added). In practical terms, the federal court concluded that there was a legitimate factual debate between the parties, and they had the right to have that dispute resolved at trial.

Reading the Glenn mailer in this light, it is clear that Schram has read too much into the federal court's ruling. The ruling was not a total-and-final vindication of Schram's legal position in the federal lawsuit; rather, it was a *partial* vindication, in that it confirmed that she had enough evidence to go forward to trial in that lawsuit. This partial vindication says little about the ultimate factual merits of her claims, and the opinion alone does not show that Velasquez made a false statement in bad faith or with actual malice. It is possible, for example, that Schram's evidence during trial would have collapsed under cross examination or other evidentiary attacks (e.g., authentication; hearsay). Or it is possible that her claims would have been vindicated by a federal jury. Given the settlement, however, it is impossible to know now.

To be fair, Schram does seem to recognize at times the more limited scope of the federal court's ruling, noting in her appellate brief, for example, that the federal court "found [that] there was a factual dispute" on her claims. But this recognition does not save her claims, as she still has not shown or otherwise explained how she could provide the necessary evidentiary context from which any defamatory or false-light implication by Velasquez might flow. The only evidence involving her earlier sex-discrimination claim that she submitted in this case was done under seal, in apparent recognition of her confidentiality duties under the settlement agreement. More peculiar, she has not cited or otherwise referenced this evidence in terms of her defamation and

-13-

false-light claims; rather, she relied on that evidence for a separate breach-of-contract claim not on appeal.[2]  What this Court is to do with the material filed under seal in terms of the defamation and false-light claims remains a mystery.

*Necessarily Subjective*.  Be that as it may, Schram's claims fail for a final, independent reason, apart from any evidentiary deficiencies.  "[S]tatements that are both objectively verifiable but also necessarily subjective" fall within a class of constitutionally protected speech.  *Edwards*, 322 Mich App at 13.  If a statement can be read to be ambiguous—plausibly to mean different things to different readers—then the statement is necessarily subjective and therefore not actionable, even if it one of its meanings could be verified in some sense.  *Id.* at 22.

The statements from Statement Two and Statement Eleven both fall into this protected category of speech.  By claiming that the Glenn mailer included an "untruth" and was "misleading and untrue," Velasquez could have been understood by a reasonable reader to mean that Schram was a liar, an objectively falsifiable proposition that could be defamatory.  See, e.g., *Ireland*, 230 Mich App at 619.

At the same time, those statements could have been read by a reasonable reader to mean that the Glenn campaign was being deceptive by framing a past employment dispute as a reason not to vote for someone in a current political campaign.  Those statements could have been read to suggest that *some*, but not *all*, of what was stated in the mailer misrepresented what really happened.  Those statements could also have been read to mean that it was misleading to point to a judge's opinion resolving a motion for summary judgment and suggesting that it had made a final determination of fact.  And as just one more plausible interpretation, those statements could have been read to suggest that some or all of the claims in the federal lawsuit were mistaken, as not every untrue statement uttered by someone necessarily means that the person is a liar; untrue statements can be made on the basis of incomplete information, an honest misperception, etc.  With these and likely other plausible understandings of Velasquez's statements, we conclude that the statements were necessarily subjective and therefore not actionable.  *Edwards*, 322 Mich App at 22 (concluding that the statements at issue had several "plausible readings" and therefore were "not actionable under Michigan law").  Thus, even if the settlement agreement poses no evidentiary burden for Schram in this lawsuit, her claims of defamation and false light still fail.

## III. CONCLUSION

---

[2] Schram attached what she called an "affidavit" to her brief in response to defendants' motion for summary disposition in the trial court.  The document was not notarized, so it is not an affidavit.  *Wood v Bediako*, 272 Mich App 558, 562-563; 727 NW2d 654 (2006) (noting that "the unnotarized affidavit filed with the complaint in this case was not valid").  Attached to the purported affidavit are documents that appear to be from Schram's federal lawsuit; these were all filed under seal.  She did not cite the purported affidavit or its attachments for either her defamation or false-light claim, but rather solely in support of her breach of contract claim.  See "Plaintiff's Brief and Opposition to Defendant Velasquez Motion for Summary Disposition," p 2.  On appeal, Schram did not cite to her purported affidavit or its attachments in the primary appellate brief, and she did not file a reply brief.

It is lamentable that, through no fault of her own, Schram became the topic of a negative political campaign. The statements to which she points, however, do not directly paint her in a defamatory manner or false light. As for any defamation by implication, Schram's claims fail for several reasons, as explained. Accordingly, the trial court did not err in granting summary disposition to Velasquez and his campaign committee.

Affirmed.

/s/ Brock A. Swartzle
/s/ Kristina Robinson Garrett
/s/ Randy J. Wallace